UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONYA MARTIN, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>BOARD OF EDUCATION OF THE BERKELEY UNIFIED SCHOOL DISTRICT, et al.,<br><br>    Defendants. | Case No. 20-cv-04389-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 84 |

## I. INTRODUCTION

Plaintiffs Sheila Quintana, Sonya Martin, and Edith Smiley have sued the Board of Education of the Berkeley Unified School District (the "Board") and its employees Donald Evans, Pasquale Scuderi, Delia Ruiz, and Maggie Riddle (collectively, "Defendants") under 42 U.S.C. § 1981 ("Section 1981") for race discrimination. Smiley has settled her dispute. Pending before this Court is Defendants' motion for summary judgment, or in the alternative, partial summary judgment regarding the remaining plaintiffs ("Plaintiffs") based on two grounds: (1) both Plaintiffs' claims are barred by the statute of limitations; (2) Martin's claim is barred by claim preclusion. (Docket Nos. 84, 88.)

## II. BACKGROUND

The parties do not dispute the following facts unless otherwise noted.

A.    Sheila Quintana

Quintana began serving as Principal of B-Tech in the Berkeley Unified School District (the "School District") on July 1, 2011. (Docket No. 84-6 Ex. A ("Quintana Dep."), 69:1-7.) She

remained in that position until June 30, 2016.

Quintana alleges that Defendants breached two contracts due to her African American race: (1) the promise that she would get the job as Principal of Berkeley High School, and (2) the agreement between the District and Union of Berkeley Unified School District Administrators (the "UBA Agreement") "disallowing discrimination in employment." (FAC ¶ 45.) Regarding the former contract, Quintana argues that, but for her race, the Board would have selected her for the Principal position for the 2014-2015 academic year; instead, it did not hire anyone for the position that year. The next year, an outside interview panel selected a white male for the position. (Docket No. 98 ("Opp.") at 8.) The candidate they selected had interviewed the previous year along with Quintana but had not progressed as far as Quintana in the interview process. (*Id.*; FAC ¶ 45.) Regarding the latter contract, Quintana has pointed to no specific acts of discrimination besides the failure to promote her, but generally contends that "[t]he discrimination continued until she was forced to resign instead of staying in such a hostile environment infested with racism against her and all persons of her race." (Opp. at 9.) As a result of the alleged breach because of her race, Quintana retired in 2019, which she alleges was earlier than she had planned to; lost past and future earnings; and experienced mental anguish and embarrassment, among other things. (FAC ¶¶ 43, 46.)

Below are the key events and timeline relevant to Quintana in this action:

- Spring 2014—Quintana applied and interviewed for the position of Principal of Berkeley High School for the 2014-2015 academic year. (Quintana Dep., 4:16-23, 24:3-15, 105:14-106:18, 108:15-25.) According to Quintana, the Board's Superintendent Donald Evans told her that if she made it through "the third level of the interview," she would "g[e]t the job." (*Id.* at 23:17-24:2.) She was the only candidate to have reached that final round of interviews. (*Id.* at 25:1-10, 108:1-12, 110:25-111:11.)
- June 4, 2014—the Board announced that no appointments had been made for the Berkely High Principal position. (Docket No. 84-6 Ex. E (6/4/2014 Berkeley Unified School District Meeting Minutes).)

- June 11, 2014—the Board announced its appointment of an interim Berkeley High Principal. (Docket No. 84-6 Exs. F (6/11/2014 Berkeley Unified School District Meeting Minutes), J (Berkeley Unified K-12 Calendar).)
- 2015—the Board engaged in a nationwide search for the Berkeley High Principal position for the 2015-2016 academic year. (Quintana Dep., 79:14-80:11.) Quintana did not reapply for the position. (*Id.* at 65:9-20, 80:15-18, 112:16-22.) A white male candidate from the prior academic year reapplied and was selected by an outside interview panel. (*Id.* at 37:11-22, 108:1-12; FAC ¶ 42.)
- April 6, 2016—Quintana publicly announced her acceptance of the Principal position with Vallejo High School. (Docket No. 84-6 Ex. I (4/6/2016 agenda of the governing board of education meeting of Vallejo City).)
- April 22, 2016—Quintana submitted her resignation to the Board (Docket No. 84-2 (Tobias-Espinosa Decl.) at ¶ 4; Quintana Dep., 69:1-19, 119:7-20, 123:22-124:8.)
- May 18, 2016—the Board sent Quintana a formal acceptance of her resignation and publicly announced B-Tech's new Principal. (Tobias-Espinosa Decl. at ¶ 6, Ex. O (letter); Docket No. 84-6 Ex. H (5/18/2016 Meeting Minutes of the Board of Education of Berkeley Public Schools).)
- June 30, 2016—effective date of Quintana's resignation. (Tobias-Espinosa Decl., ¶ 6, Ex. O (letter).)

B.  Sonya Martin

Martin began working in the Berkeley Unified School District in 2002 and held several positions between then and 2014. She was the Principal of the Jefferson Elementary School ("Jefferson") between July 1, 2014, and June 30, 2016, reporting to Defendant Riddle.

Martin alleges that, during her tenure as Jefferson's Principal, Defendant Riddle—Martin's supervisor—retaliated against her for trying to remedy racial segregation among students in the after-school program. (Opp. at 4–5.) According to Martin, Riddle created a hostile work environment. (*Id.* at 5.) When she reported the conduct to Riddle's supervisor—Defendant Scuderi, Scuderi did nothing and testified that he did not recall that Martin had made such a report.

3

(*Id.*) Martin also generally alleges that, due to her race, Defendants breached her employment contract for the Principal position at Jefferson by (1) replacing her after her position as principal ended on June 30, 2016 with a white employee who had fewer qualifications and experience; (2) wrongfully evaluating her outside her presence in January and May 2016; and (3) not abiding by the Union Agreement to place her in an available administrative position when they informed her in March 2016 that she would be demoted to a classroom teacher position after her time as principal ended. (FAC ¶¶ 28-30; Tobias-Espinosa Decl., ¶ 13, Exs. W (letter), S (mid-year evaluation), Y (summative evaluation).) Martin further alleges that, but for her race, the Board would not have reported her to the Commission on Teacher Credentialing (the "Commission") (to which the Board reported her in September 2016) for job abandonment when she did not appear to her new position. (FAC ¶ 31; Docket No. 84-6 Ex. BB.)

Below are the key events and timeline relevant to this action:

- July 1, 2014—Martin became Principal of Jefferson. (Docket No. 84-6 Ex. B ("Martin Dep."), 68:3- 12.) Defendants Evans, Scuderi, and Riddle were on Martin's hiring panel.

- June 9, 2015—Martin received a satisfactory performance review from Riddle. (Docket No. 84-3 (Riddle Decl.), ¶ 3; Tobias-Espinosa Decl., ¶¶ 2-3, 7, Ex. P (evaluation form).)

- January 2016—Martin requested, the Board approved, a long-term medical leave of absence. (Martin Dep., 117: 21-118:6, 119:8-10, Tobias-Espinosa Decl., ¶ 8, Ex. R (HR letter).)

- Late January 2016—Shortly after Martin began her leave, she received a mid-year evaluation regarding her pre-leave performance per policy requirement. (Docket No. 84-6 Ex. C ("Riddle Dep."), 41:12-42:11; Riddle Decl., ¶¶ 7-8; Tobias-Espinosa Decl., ¶ 9, Ex. S (evaluation).) In the evaluation, Riddle observed "minimal evidence of effective leadership" by Martin and identified a "lack of initiative in formulating or communicating a vision for the school, which is an essential role for the principal." (Tobias-Espinosa Decl., ¶ 9, Ex. S (evaluation).)

4

School Governance Council members reported that Martin was not actively participating in their meetings, and that she cancelled meetings with little notification. (*Id.*) Teachers complained that Martin was not actively participating in BUSD's Professional Learning Community work. (*Id.*) During one such session, Riddle observed that Martin was asleep during the training. (*Id.*) Riddle concluded that "significant improvement is essential" (*id.*) and prepared a Performance Improvement Plan ("PIP") for Martin. (Riddle Dep., 95:6-14; Riddle Decl., ¶ 8; Tobias-Espinosa Decl., ¶ 8, Ex. T.) The PIP instructed Martin to meet with Defendant Scuderi upon her return to debrief concerns Jefferson teachers presented to him. (Tobias-Espinosa Decl., ¶ 8, Ex. T.) Martin never did so.

- February 10, 2016—the Board approved the issuance to Martin of a Notice of Possible Reassignment of Administrator. (Tobias-Espinosa Decl., ¶ 12, Ex. V (notice).)
- February 25, 2016—the Board issued the notice of possible to another position for the 2016-2017 academic year. (*Id.*)
- March 1, 2016—Martin served Evans and Riddle her complaint against them with the California Department of Fair Employment and Housing for issuing a performance evaluation while Martin was absent.[1]
- March 17, 2016—the Board sent Martin a letter confirming her release from the Principal position and reassigned her as a Special Education Teacher. (Tobias-Espinosa Decl., ¶ 13, Ex. W (letter).)

---

[1] The Court denies as moot Defendants' request to exclude the late-filed exhibit supporting this allegation because, as explained below, this event does not affect the Court's ruling. Plaintiffs filed both their opposition and supporting exhibits late. The opposition was originally due on January 31, 2023. (Docket No. 89 (stipulated briefing schedule).) Plaintiffs sought to extend that deadline three times, sometimes two days after the operative deadline. (*See, e.g.*, Docket No. 94.) In an effort to resolve disputes on the merits, the Court granted each extension and set the final deadline on February 14, 2023. (Docket No. 95.) On February 15, 2023—the day after the deadline—Plaintiffs filed their opposition without any supporting exhibits. (Docket Nos. 97, 98.) The next day, they sought to file the accompanying exhibits on February 17—three days after the deadline. (Docket No. 99.) Plaintiffs ended up filing them in two batches on February 18 and 19 and filed an erratum to one exhibit on February 20. (Docket Nos. 102-104.) To date, Plaintiffs still have not filed all the exhibits referenced in their opposition.

- April 28, 2016—the Board informed Martin that her new teaching assignment would be at Berkeley High, which Martin considered a demotion. (Tobias-Espinosa Decl., ¶ 13, Ex. X (letter); FAC ¶ 28.)
- May 4, 2016—the Board announced the appointment of a new principal to Jefferson. (Docket No. 84-6 Ex. G (Board Meeting Minutes).)
- Mid to late May 2016—Per policy, Riddle emailed and mailed Martin a summative evaluation, attaching a copy of the mid-term evaluation. (Riddle Decl., ¶ 9; Tobias-Espinosa Decl., ¶ 15, Ex. Y.)
- June 29, 2016—According to Martin, she withdrew her application to the Vice Principal position at Longfellow School when she learned that Riddle was on the interview panel but had recused herself from the interview. (Docket No. 98 ("Opp.") at 5–6.[2])
- June 30, 2016—Martin remained on leave until the last day of her position as Jefferson's Principal. (Espinosa Decl., ¶ 11, Ex. U (doctor's notes).)
- August 22, 2016—the Board Director of Personnel Services, Evelyn Tamondong-Bradley, reminded Martin, through email, that she was expected to be in attendance at her newly assigned role on August 26, 2016. (Espinosa Decl., ¶ 11, Ex. Z.)
- August 26, 2016—Martin failed to appear on the first day of school for staff. (*Id.*) The Board's HR Department attempted several times but failed to reach Martin. (*Id.*)
- August 29, 2016—Tamondong-Bradley wrote to Martin that the Board would report her to the Commission for job abandonment if she did not report to Berkeley High on August 30, 2016.
- Around September 15, 2016—Martin started working at Yu Ming Charter School. (Docket No. 84-4 ("Leonard Decl."), ¶ 5, Ex. CC (employment agreement); *see also* Martin Dep., 166:6-25.)

---

[2] The cited exhibit was not in fact attached to the Plaintiffs' opposition and Defendants object to it. Because this event does not affect the Court's ruling, the objection is overruled as moot.

- September 20, 2016—the Board reported Martin to the Commission after Martin's continued absence. (Docket No. 84-6 Ex. BB.)

C. Procedural Background

Plaintiffs filed this action on June 30, 2020. (Docket No. 1.) Defendants moved for summary judgment on November 23, 2022. (Docket No. 84.) Plaintiffs opposed, arguing that the parties had engaged in limited discovery solely for the purpose of settlement conferences and that they needed more discovery to properly oppose Defendants' motion. (Docket No. 85.) Following the Court's order, Defendants elected to limit their motion to the grounds of statute of limitations and preclusion only. (Docket No. 88.)

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

The moving party has the initial burden of production to demonstrate the absence of any genuine issue of material fact. *Playboy Enters., Inc. v. Netscape Communic'ns Corp.*, 354 F.3d 1020, 1023–24 (9th Cir. 2004). Once the moving party meets its initial burden, the nonmoving party must "designate specific facts showing there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). "If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine issue for trial." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (citation omitted).

### IV. QUINTANA'S CLAIM IS TIME-BARRED

The parties agree that the applicable statute of limitations for Quintana's Section 1981 claim is four years. (Opp. at 11.) "A four-year statute of limitations governs actions arising under federal statutes enacted after December 1, 1990." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 974, n.5 (9th Cir. 2004). That limitations period applies to "hostile work environment and wrongful termination claims under § 1981 that were made possible by the Civil Rights Act of 1991." *Id.* (citing *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004)). Plaintiffs have alleged hostile work environment and Martin appears to have alleged wrongful termination. The Court therefore agrees with the parties that the statute of limitations is four years. Since Plaintiffs filed this action on June 30, 2020, their claims must have accrued on or after June 30, 2016 (the "Critical Date") to be timely.

Quintana's claim accrued, at the latest, by April 22, 2016, when she resigned from the School District. "[A] claim accrues under federal law when the plaintiff knows or has reason to know of the actual injury." *Lukovsky v. City & County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008). Thus, the statute of limitations begins to run when a plaintiff knows (1) that they have been injured and (2) who caused their injury. *Id.* This occurs regardless of if "at that point in time the plaintiff[] did not know of the legal injury, i.e., that there was an allegedly discriminatory motive underlying the failure to hire." *Id.* It is enough that the plaintiff was injured. Quintana's claim regarding both alleged contracts accrued before the Critical Date.

The first alleged contract breach concerns Quintana not being selected for the Principal position. (FAC ¶ 45.) She knew in 2014 that the Board did not select her for the principal position. (*Id.* ¶¶ 40-41; Opp. at 7-8; Quintana Dep., 22:22-23:7, 27:11-28:20.) In 2014, the head of HR, Delia Ruiz, called Quintana and told her "Sheila, we're going to repost the position. We are not going to hire you." (Quintana Dep., 27:11-13; 80:19-22.) Quintana then called Defendant Evans, and he also told her that she had not been selected for the Principal position and that the position would be reposted. (*Id.* at 27:18-28:20.) Quintana knew about her injury by 2014, well before the Critical Date.

The second alleged contract "disallow[s] discrimination in employment." (FAC ¶ 45.)

8

1    Quintana did not plead any other discriminatory act by Defendants except for the Board's rejection

2    of her candidacy for the Principal position. Even if there were other acts that comprise her

3    discrimination claim, "[t]he discrimination continued against Quintana *until she was forced to*

4    *resign*." (Opp. at 9 (emphasis added).) Thus, by Quintana's own allegation, she was aware of the

5    discrimination against her at least by the time it "forced" her to resign on April 22, 2016, months

6    before the Critical Date.

7    Quintana's assertion of the "continuing violation" doctrine cannot save her claim. "[A]

8    continuing violation is really a series of repeated violations," and "each [violation] begins a new

9    statute of limitations period as to that particular event." *Flynt v. Shimazu*, 940 F.3d 457, 462, n.3

10   (9th Cir. 2019) (quotation omitted). Quintana has not identified any violation within the statute of

11   limitations and has conceded that discrimination only continued "until she was forced to resign"

12   before the Critical Date. Quintana's claim is thus time-barred.

### V.    MARTIN'S CLAIMS ARE TIME-BARRED

14   Martin has alleged breach of two contracts: (1) her employment contract for the Principal

15   position at Jefferson, and (2) the UBA Agreement that requires the Board to place her in an

16   available administrative position. (FAC ¶ 30.) She also has alleged hostile work environment.

17   (*Id.* at ¶ 29.) None survives summary judgment.

18   Martin's claim regarding both contracts accrued shortly after March 17, 2016, when the

19   Board sent Martin a letter releasing her from the Principal position and reassigned her as a Special

20   Education Teacher. (Tobias-Espinosa Decl., ¶ 13, Ex. W (letter).) In her opposition, Martin does

21   not contest the receipt of the notice. Between then and the Critical Date, the Board also sent her

22   the notice of reassigned school on April 28, 2016, and publicly announced the appointment of a

23   new principal to Jefferson. (Tobias-Espinosa Decl., ¶ 13, Ex. X; Docket No. 84-6 Ex. G.) Martin

24   does not contest that she received these notices either. Martin thus suffered injury no later than

25   April 28, 2016, months before the Critical Date. The continuing violation doctrine does not save

26   Martin's claim regarding the contracts for the same reason as for Quintana's claim, as explained

27   above. Moreover, the discriminatory acts causing Martin's injury were discrete and complete acts

28   and not amenable to the continuing violating doctrine. *See Beauregard v. Lewis Cnty., WA*, 329 F.

App'x 710, 712 (9th Cir. 2009) (noting that because plaintiff's claims, including a Section 1981 claim, "are based on discrete acts by Lewis County officials, the continuing violations exception does not apply"); *Grigorescu v. Bd. of Trustees of San Mateo Cnty. Cmty. Coll. Dist.*, No. 18-CV-05932-EMC, 2019 WL 4082898, at *4 (N.D. Cal. Aug. 29, 2019) (stating in the context of Title VII claims, that "'[a] discrete retaliatory or discriminatory act occur[s] on the day that it happen[s].' Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002))).

Martin's hostile work environment claim accrued, at the latest, by the end of May of 2016, when Riddle sent Martin her evaluations—the last alleged interaction between Defendants and Martin. Again this was before the Critical Date. The continuing violation doctrine does not help this claim either. For hostile work environment claims, "[p]rovided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). The only day within the filing period when Martin was still working for the Board was June 30, and she has alleged no act occurring on that day. *See* FAC ¶ 28 (stating that Martin never accepted the teacher position and that her contract expired in June 2016). A hostile work environment cannot exist once after an employment relationship has been terminated. *See Liu v. UC Berkeley/UC Regents*, No. 15-CV-04958-PJH, 2017 WL 412639, at *7 (N.D. Cal. Jan. 31, 2017), *aff'd sub nom. Liu v. Regents of Univ. of California*, 723 F. App'x 498 (9th Cir. 2018) (stating that "any hostile work environment, by definition, ended [when plaintiff was laid off] in 2009"); *Benveniste v. Rehfahzade*, No. CV103266GHKAJWX, 2010 WL 11601047, at *3 (C.D. Cal. Aug. 17, 2010) ("Plaintiff's allegations of hostile work environment sexual harassment culminated in her termination and are not encompassed by claims of harassment occurring after the employment relationship ended."); *Ware v. Cnty. of Sacramento, Off. of Pub. Def.*, No. 2:06-CV-00913-RRB, 2006 WL 2829979, at *4 (E.D. Cal. Sept. 29, 2006) (holding that "whatever racial harassment or hostile work environment existed ended when [plaintiff] was terminated"). All conduct allegedly perpetuating

a hostile work environment that occurred post-employment—Defendants reminding Martin to report to her demoted post, threatening to report her to the Commission, and reporting her to the Commission—thus are not continuing violations of employment law.  The accused acts outside the filing period therefore are barred.[3]

## VI. CONCLUSION

The Court **GRANTS** Defendants' motion for summary judgment.

This order disposes of Docket No. 84.  The Clerk is instructed to enter judgment for Defendants and close the case.

**IT IS SO ORDERED**.

Dated: March 30, 2023

_____
EDWARD M. CHEN
United States District Judge

---

[3] Since Plaintiffs' claims are time-barred, the Court need not address the question of claim preclusion.

11